### In re ATLAS PIPELINE CORPORATION.

No. 6203.

District Court, W. D. Louisiana, Shreveport Division.

July 15, 1941.

J. H. Tucker, Jr., of Shreveport, La., for Receiver.

John M. Madison, of Shreveport, La., for Atlas Pipeline Corporation.

Edward A. G. Porter, of Philadelphia, Pa., and Fred Simon, of Shreveport, La., for Pennsylvania Co., trustee for the Second Bond Issue.

Noah A. Stancliffe, of New York City, and Fred Simon, of Shreveport, La., for Second Mortgage Bondholders Committee.

E. Leland Richardson, of Baton Rouge, La., for State of Louisiana.

J. N. Marcantel, of Shreveport, La., for ordinary creditors.

John L. Crawford, of Fort Worth, Tex., for Securities and Exchange Commission.

Elias Goldstein, of Shreveport, La., and Thomas Hart, of Philadelphia, Pa., for First Trust Co. of Philadelphia, trustee for First Mortgage Bondholders Protective Committee.

DAWKINS, District Judge.

The Trustee has presented to the court for tentative approval and submission to creditors a plan of reorganization for this corporation, which already has the approval of representatives of all classes of creditors. However, the Securities and Exchange Commission, to whom it was sub-

mitted under provisions of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., has filed a report to the effect that the plan is neither fair nor feasible.

The affairs of the Atlas Pipeline Corporation and its affiliated refinery were consolidated in a reorganization in this court approximately five years earlier. At that time and continuously since, its chief difficulty has been that while the properties consisted of an inland refinery of some 8,000 barrels daily capacity with pipelines leading into East Texas, South Arkansas and Louisiana oil fields, it had no production or independent sales outlets and was at the mercy of both producers of crude and purchasers of refined products.

Since it has been in the hands of this court, first through receivership beginning in May, 1939, and then a Trustee in the present proceeding, its operations have experienced a decided improvement. The court has judicially declared it insolvent, eliminated participation of common stock and the proposed plan therefore attempts to provide for the claims of creditors only. The plan will not be quoted or stated in detail. However, in general terms, it proposes to create a new corporation for the acquisition of assets upon which one of the leading engineering firms of the country, by appointment of the court, in May, 1939, fixed a going concern value of approximately $2,500,000. The plant, pipelines and accessories, with minor exceptions are encumbered with both a first and second mortgage, but there are several thousand dollars of current and free assets in which the ordinary creditors, in event of liquidation, would be entitled to participate. For this reason, it is proposed after providing for Federal and State taxes, to pay the ordinary creditors 10¢ on the dollar in cash or the equivalent of their equity in the free assets and to issue to the first mortgage bondholders, whose claims, with interest accrued to May, 1941, amounted to $961,400, new first mortgage bonds, which will bear 4½% interest instead of 6% of the old issue; and to the second mortgage creditors in full settlement of their claims amounting with accrued interests to the same date, to $1,500,750, $435,000 of 4% preferred stock, dividends for the first three years to be contingent upon earnings, but unconditional thereafter. In addition, an extra $50,000 of first mortgage bonds are to be sold for cash at their face value to one of the holders of second mortgage bonds, who will, in turn, sell them to persons participating in the plan referred to as the "Purchasing Group". This is for the purpose of adding to the operating capital of the new corporation.

Thus, for the first three years, the unconditional interest charge of 4½% will be limited to the $1,011,400 of first mortgage bonds, with the additional obligation to pay 4% on the preferred stock if earned. This is as against the present interest of 6% upon the principal sum of $836,000 of first mortgage bonds and $1,305,000 of second mortgage bonds, on all of which no interest has been paid since 1938.

The plan further contemplates the issuance of 5,000 shares of common stock, all of which is to be subscribed by the Purchasing Group at $20 a share, or a total of $100,000 to be paid in cash to the new company. To this is to be added $50,000 proceeds of new bonds and approximately $150,000 now in the sinking fund of the Trustee of the first mortgage bonds, together with any operating surplus now in the hands of the Trustee as capital. The Purchasing Group will also obligate itself to advance in excess of $200,000 either in cash or credits to be used for the same purpose. Thus, a sum of $500,000 in round figures in cash or its equivalent above any surplus in the hands of the Trustee will be made available for operations, payment of taxes, 10% to ordinary creditors and reorganization expenses.

Provision is made for a sinking fund at the rate of $50,000 per year, but for the first three years credit may be taken against it for money spent in construction and deferred maintenance, as well as for making major repairs recommended by a creditable engineering firm.

The Purchasing Group, who will also become the owners of the common stock, vested with management of the company's affairs, will enter into a contract for three years to furnish ample crude oil to keep the refinery running at approximately its capacity. As stated earlier, this is something it has never before had, which I am convinced has been the major difficulty against success.

Based upon the experience of the Trustee for the five months, December 1st, 1940 to March 31, 1941, which was a season of slack activity, profits before bond interest and depreciation were $263,000 annually,

and the net profit thereafter was $127,403.-21; but by including the actual results of the months of April and May, profits above interest and depreciation were increased to $334,000 annually. These figures give no consideration to possible revenues from the pipelines, which up to a few months ago amounted to many thousands of dollars each year. With the advantage of the new management, it seems highly probable that substantial revenues may be realized from this source.

The report of the Commission consisting of some sixty odd pages, criticized the figures of the Trustee in calculating or estimating the prospective earnings and consequent success of the new company in numerous respects, and of course, speaks for itself. I shall not undertake to discuss these in detail, but think it sufficient to say that while no one can be certain as to such matters, I believe that the Trustee has adopted a reasonable and conservative basis for his calculations, which are being borne out by his own experience over the period since certain improvements and changes in operations were instituted in the fall of 1940. The feasibility of the plan would seem to be further attested, if not assured, by the fact that the Purchasing Group, who will have charge of the new management, are men of large means with an assured supply of crude oil, which they agree to furnish upon a reasonable basis, so as to keep the refinery operating at something near capacity. Their investment of $100,000 in the common stock and willingness to extend additional credit or cash for another $200,000 is very tangible evidence of the faith of these experienced operators in the success of the undertaking. When this is considered, along with the fact that bankers and business men of wide experience acting for and interested with the present first and second mortgage bondholders, have unqualifiedly approved the plan, the court would hesitate to turn it down and adopt the suggestion of the Commission that the properties be scrapped and liquidated as junk.

■ I am impressed that the views of the Commission are somewhat cold blooded and are based on the theory that no new security should be issued which is not worth, at the time, its face value. If the organization of a new enterprise was involved that view might be justified, but when you have a situation such as is presented here, where it is the duty of the court to try to protect the interest of all creditors as far as the assets and circumstances of the debtor permit, a more practical view should be taken. Liquidation, according to the Commission's own calculation, would wipe out the second mortgage creditors entirely, except to the extent that they might participate along with the ordinary creditors in the free assets.

■ It seems to me that the proposal is fair in that it preserves the position of the first mortgage creditors to the full amount of their principal and accrued interest, and the only sacrifice they are making is in the reduction of the interest rate from 6 to 4½% for the future. At the present time, the latter is more than can be obtained on a reasonably safe investment and the very spirit of the law which permits reorganization of embarrassed corporations appears to contemplate that there shall be some giving and taking by all concerned. If it is probable that the plan will realize a greater portion of the equity of any class of creditors in the assets of the corporation, then this is a sufficient consideration for the sacrifices that may be made to that end. The results of liquidation are highly speculative and uncertain. Under the plan the ordinary creditors will receive the equivalent of their share in the free assets and there will be substantial reduction in tax liability and other obligations which might have a preferred status in the event of liquidation.

Under all the circumstances, I think that the plan is both fair and feasible, and should be submitted to the creditors for their consideration.

Proper decree should be presented.