### In the Matter of YUBA CONSOLIDATED INDUSTRIES, INC., a Delaware corporation, Debtor.

### No. 64013.

United States District Court
N. D. California, S. D.
June 15, 1965.

Goldstein, Barceloux & Goldstein by Burton J. Goldstein and Ralph Golub, San Francisco, Cal., for trustee Frank T. Andrews.

Rothschild & Phelan, August Rothschild, San Francisco, Cal., and Gendel & Raskoff, Shapiro & Quittner, Bernard Shapiro, Los Angeles, Cal., for a committee of unsecured creditors.

Harold Levy, Ellis, Mathews & Levy, and Sidney Rudy, San Francisco, Cal., for a debentureholders committee.

Charles J. Odenweller, Jr., Trial Atty., Exchange Commission, Washington, D. C., and San Francisco, Cal., Quittner, Stutman, Treister & Glatt by Francis Quittner, and Keatinge & Sterling, Rich-

ard Keatinge, Los Angeles, Cal., for debtor Yuba Consolidated Industries, Inc.

Athearn, Chandler & Hoffman, Walter Hoffman, Clark W. Maser and Murray Smith, San Francisco, Cal., for Judson Steel Corp., an unsecured creditor.

Trippet, Yoakum & Ballantyne, Thomas H. Carver, Los Angeles, Cal., for John W. Lucas, Jr., and others, creditors and stockholders.

Hartly Fleischmann and Jaeckle Fleischmann, Kelly, Swart and Augspurger, Buffalo, N. Y., for certain unsecured creditors.

Pillsbury, Madison & Sutro, San Francisco, Cal., for certain unsecured creditors.

Everett S. Layman, San Francisco, Cal., for John L. McGara.

Hill, Farrer & Burrill and John J. Wilson, Los Angeles, Cal., for certain unsecured creditors.

John Philip Coghlan and Chickering & Gregory, San Francisco, Cal., for indenture trustee of said debtor's 5½% convertible subordinated debentures.

Gilbert C. Wheat, H. Donald Harris, Jr., and Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for Texas-Zinc Minerals Corp., a stockholder of debtor.

Samuel B. Stewart, Charles E. Cooper, C. Thorne Corse and Eldon C. Parr, San Francisco, Cal., for Bank of America Nat. Trust and Savings Ass'n., a creditor.

Dario DeBenedictis and Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for certain unsecured creditors.

HARRIS, Chief Judge.

## PRELIMINARY STATEMENT

The bankruptcy proceedings before this Court culminating in the present re-

organization and approval of the joint plan as submitted, represent the most complex reorganization proceeding in which the Securities Exchange Commission has participated over the last twenty-five years.[1]

An understanding of the interplay of the economic forces that brought about this business catastrophe, as well as the benign and constructive forces which led to the present joint plan of reorganization, necessarily entails a brief review of the record.

## GENERAL OUTLINE OF PROCEEDINGS

The records and proceedings delineate the acquisition by the former management of a vast complex of disassociated entities without a central theme or common pattern. The original direction of the company under John McGara as President seemed destined for success. However, the trend of his management, diverse corporate acquisitions and too rapid expansion soon made it apparent that undercapitalization with a heavy debt structure and consequent insolvency would be the inevitable and costly result.

On September 6, 1961, the debtor filed its petition for arrangement pursuant to Chapter XI of the Bankruptcy Act. The Securities Exchange Commission's motion to dismiss the proceeding pursuant to Section 328 of Chapter XI was granted on March 15, 1962, and the Debtors' Amended petition under Chapter X was approved on March 21, 1962.

The Commission's motion was met with considerable resistance, particularly from certain larger creditors who desired immediate liquidation.[2]

The efforts made and the industry exhibited by C. J. Odenweller, Jr., Esq., trial attorney for the Securities Exchange Commission, and his then able assistant, Stuart H. Kaplan, Esq. should

---

1. Proceedings of March 10, 1965, Tr. p. 1977, 1. 13–16.

2. It is felt that if a decision must be made now, it is the position of the Creditors' Committee that no fair or equitable reorganization is presently feasible and

that the interest of creditors could be served best by an orderly liquidation under the control of a trustee in bankruptcy. (Tr. p. 13, 1. 5, Motion to Amend Proceedings)

be commended for, as a result of their efforts, the Court was placed in possession of the factual and economic background and data which provided the predicate for granting the motion.

The Court appointed Frank T. Andrews as Trustee on March 21, 1962. He encountered an almost hopeless situation with all of the concomitants of insolvency present. The complete dedication, talent and industry of the Trustee in directing the affairs of the company, planning its financial program, hiring key employees, together with a complete command of the accounting aspects, in large measure made the result possible which the company presently enjoys.[3]

Also, recognition should be given to the team of lawyers headed by Burton J. Goldstein, Esq., including Ralph Golub, Esq., Austin C. Clapp and Joseph B. Purteet, representing the Trustee. The litigation which they encountered was vast, complex and demanding and required the highest degree of industry and talent. They discharged their obligation in the finest tradition.

Brief reference should be made to the statutory proceedings conducted by the Trustee, particularly his report and notice under Section 167(5) and 167(6) of the Bankruptcy Act:

"The various financial ratios, trends and economic conditions at the close of 1960 clearly characterized Yuba as a company in serious financial and business difficulties. To summarize: Yuba found itself in a top-heavy debt structure brought about, mainly, by too rapid expansion through the acquisition of new companies, declining economic conditions of industries in which it was engaged, taking work at low prices or at a gross loss, poor executive planning, and excessive administrative, promotional, and general expenses.

All of these factors reacted upon and affected each other, and the stage was set for the financial debacle of 1961." (p. 3, Report and Notice of Trustee)

\* \* \* \* \* \*

"In the face of worsening conditions, on March 21, 1961, Yuba's Directors elected a new president who knew nothing about the financial condition of the Company and was not skilled in finance and administration of multiple plant operations. When the new president took office, Yuba was geared to a sales volume of $100 million a year, and expenses of administration, sales promotion, and sundry overhead expenses were at a maximum. The new president immediately announced a plan for the reduction of annual sales volume to $35 million, and proceeded to this end. The sales backlog dropped from $68 million in March, 1961 to $33 million in September, 1961. However, there was no significant decrease in administrative, sales and general expenses at the Division level, and Head office overhead declined, on the average, by only $17,000 a month from April to September, 1961, as compared with the overhead at the January-March level. The operating results for 1961 clearly show that the reduction in sales volume was too rapid and the cutback of expenses too slow. In addition to the new sales policy and the lingering effect of the former expansion policy, further strain on the business arose in 1961 from contracts in connection with the Titan II missile bases near Tucson, Arizona, and Little Rock, Arkansas, which as early as April 18, 1961 showed signs of heavy losses. Although all Divisions and Subsidiaries of Yuba, except five, lost money in 1961, and some of the losses were very substantial, the cash requirements and losses incurred on the missile bases were the 'straw that broke the cam-

---

3. The manifold duties of the Trustee are set forth *in extenso* commencing p. 45, Vol. I, Hearing on Plan for Reorganization)

el's back'. In August, 1961, Yuba could not meet the pay rolls for the missile bases and the bank refused new financing unless the company file a petition under Chapter XI of the Bankruptcy Act which was done on September 6, 1961. After the latter date, heavy losses continued and were augmented by liquidation sales and other hectic procedures and events under Chapter XI. The excessive outlays of cash in acquiring Judson, Pacific-Murphy Corp. and Southwest Welding & Manufacturing Co. in 1958, the resulting increase in bank loans, together with declining profits on these investments, and management's persistence in remaining in the reinforcing steel business contributed greatly to Yuba's difficulties by generating losses of more than $10 million from 1959 to 1961, inclusive.

When the Trustee was appointed, the proceedings under Chapter XI had been in force approximately 6½ months. Without question, the Chapter X proceedings inherited almost insurmountable operating difficulties and administrative impediments. The objective of Chapter XI was liquidation and, to that end, backlogs of work dwindled, sales efforts were curtailed and frustrated, many key employees resigned, or were terminated, collection of accounts was neglected, many vendors required cash on delivery of materials, performance bonds were obtainable only upon depositing cash with the insurer, many customers withheld or cancelled orders, job bidding was careless and haphazard, there were numerous carry-over and continuing job losses, and confusion prevailed respecting litigation, interpretation of agreements, and with product warranties. The net loss for the year 1961 was $14,106,-252." (Pp. 4, 5, 12, Report and Notice of Trustee)

## THE SEVERAL PLANS OF REORGANIZATION

The Trustee's initial plan of reorganization was filed on October 20, 1964. The submission of this plan was preceded by an intensive investigation conducted by the Trustee, as well as by the firm of Booz, Allen & Hamilton, Inc. (Booz-Allen), management consultants appointed by the Court to report on the feasibility of reorganizing the debtor. The elaborate report recommended the reorganization of the company. Lengthy hearings were conducted and the several analysts who participated in compiling the report on feasibility of reorganization were examined by all of the interested parties. This report, in part at least, afforded the Trustee a basis for a comparative analysis, as well as for certain basic findings and conclusions.

The hearing on the Trustee's plan commenced on November 23, 1964, and continued thereafter. During the course of the proceedings the Creditors' Committee, the Debentureholders' Committee and the Judson Steel Corporation, finally joined him in the presentation of a joint plan of reorganization, the original of which was filed on February 16, 1965. Extended hearings were conducted on the joint plan, including an intensive examination of the Trustee concerning his conduct in office and the manifold corporate duties cast upon him.

In addition, during the course of these hearings, the Debentureholders' Committee presented Mr. Ross J. Cadenasso, a security analyst employed by Blyth & Co.

It is significant to note that the close cooperation between the attorneys for the Trustee and the attorneys representing the Creditors' and Debentureholders' Committees and Judson Steel Corporation resulted in the achievement of the plan presently submitted to this Court and denominated "Joint Plan of Reorganization of Trustee, Creditors and Debentureholders (Second Revised)."

At the conclusion of the hearings referred to, the Court found the Joint Plan

of Reorganization worthy of consideration and referred it to the Securities Exchange Commission for an advisory report. This report filed May 4, 1965, is now before the Court for all purposes under Section 172, Chapter X, of the Bankruptcy Act. (11 U.S.C. § 572)

The conclusion, in part, reached by the Commission in the report is as follows:

> "The plan would result in fair and equitable treatment among the creditors on the basis of our valuation of the debtor. The plan is also feasible." (P. 31, Advisory Report)

With respect to the all-important problem of going-concern value and the essential ingredients forming a part thereof, the Commission observes:

> "Chapter X requires that, to be approved and confirmed by the Court, the plan of reorganization must be 'fair and equitable' (Sections 174 and 221(2)). A finding of fairness requires first a determination of the value of the Debtor's assets, and in reorganization reasonably foreseeable earnings are the primary basis for determining such value. Prospective earnings are capitalized at an appropriate rate which reflects the business risk of the enterprise.

> Since a valuation based upon future earnings, as the Supreme Court said, requires 'a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance.' (a) In the present proceeding, in view of the substantial property dispositions prior and during the trusteeship, the past record over-all affords virtually no relevant criterion for the future. (b) The reorganized company will retain only some of the properties that the Debtor owned or acquired prior to the proceeding."

---

> "(a) Consolidated Rock Products Co. [v. Du Bois], 312 U.S. 510, 526 [61 S.Ct. 675, 85 L.Ed. 982] (1939)

> (b) See The Higbee Company, 8 SEC 777, 784 (1941)"

(Advisory Report Securities and Exchange Commission, pp. 8, 9)

\* \* \* \* \* \*

> "We can, in view of our previous discussion of these items, accept the Trustee's valuation of plant and equipment expenditures, present value of the Gold Fields earnings and the sales proceeds of Yuba Development and of the other properties. As noted previously, there is a sharp difference between Cadenasso's and the Trustee's estimates of realizable sales proceeds from the Gold Fields properties, and the record is not adequate to resolve this difference. For purposes of our total valuation, we shall assume the Trustee's estimate of $714,000 as a minimum value.

> On the basis of minimum values for excess working capital and for the Gold Fields properties and the other values, we arrive at a total value of $13,398,000 for the Debtor's assets. Booz-Allen's total valuation is $8,749,000 to $9,149,000, the Trustee's $12,061,000, and Cadenasso's is $13,585,000. These total valuations are not directly comparable with ours because, as already described, adjustments need to be made in the tax savings for 1969 and in Booz-Allen's value of the Gold Fields

earnings. Table VII below shows our total valuation as compared with the adjusted totals for Booz-Allen, the Trustee and Cadenasso:

TABLE VII

| | Booz-Allen | Trustee | Cadenasso | Commission |
|---|---|---|---|---|
| | | | (000 omitted) | |
| Capitalized earnings | $(6,400 (6,800 | $ 7,836 | $ 8,487 | $ 8,148 |
| Tax Savings [4] | 1,295 | 1,660 | 1,660 | 1,660 |
| Excess working capital | 158 | 1,050 | 1,050 | 1,600 |
| Capital expenditures | (446) | (455) | (455) | (455) |
| Gold Fields earnings | 1,044 | 1,288 | 1,288 | 1,288 |
| Gold Fields Properties | 714 | 714 | 1,642 | 714 |
| Yuba Development Properties | 118 | 173 | 118 | 173 |
| Other properties | — | 270 | 270 | 270 |
| Total | $(9,283 (9,683 | $12,536 | $14,060 | $13,398" |

(Advisory Report, pp. 25, 26)

---

■ The sifting, grinding and processing of the mass of figures and relevant data heaped into the judicial hopper requires resolution. This final resolution on the part of the Court does not represent absolute mathematical certitude. An educated appraisal of the future based upon an informed judgment is the criterion.

The weeks and months of effort expended by the Court and all of the interested parties ultimately contributes to a judgment which must be viewed in the realities of the corporate reorganization. Realistic findings conservative enough to be in consonance with future undetermined factors and corporate vicissitudes justify the Court in finding and adopting the computations attributed to the Trustee on value as adjusted in the total amount of $12,536,000.

On the basis of the record the parties adopted the Trustee's forecast of earnings of $679,000 per year. For the purpose of determining the appropriate rate of capitalization and the price-earnings ratio, the Trustee and Booz-Allen used marketing prices of common stocks as related to the earnings of four companies. Booz-Allen obtained average price-earnings ratios ranging from fourteen to fifteen times, while the Trustee

---

4. The provision for tax savings as discounted in the amount $1,660,000 is valid. The availability of net operating loss carry-overs to Yuba after reorganization under Chapter X, is borne out by the facts. It affirmatively appears that the tax loss carry-over is available to the reorganized corporation as a continuing enterprise and should be capitalized. The all-important question whether there has been a continuity of interest has been adequately preserved in the recognition and classification of creditors. The following authorities give recognition to this principle: Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775; Helvering v. Cement Investors, Inc., 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649; Atlas Oil and Refining Corp. v. Commissioner, 36 T.C. 675; Maxwell Hardware Co. v. Commissioner, 41 T.C. 386, reversed in 343 F.2d 713 (1965) (9th Cir.).

obtained an average of 14.42 times. The Trustee, after applying a 20% discount rate,[5] obtained a ratio of 11.54 times. Cadenasso, it appears, selected a group of twenty-four companies engaged in the manufacture generally of capital goods and, as disclosed by his cross-examination,[6] these companies were not as directly comparable to the reorganized debtor as were those of the Trustee whose selections engaged in manufacturing operations generally comparable to Yuba. Cadenasso selected 12.5 times as the ratio applicable to the earnings forecast of $679,000 per year.

Frank T. Andrews, the Trustee, since his assumption of the responsibilities of office has lived with the corporate problems and crises as they have arisen, including the hiring of top personnel, complicated financing, marketing, mark-up and market acceptability; all viewed in the environment of a bankruptcy proceeding.

■ He was and is able to view the future in the light of the past, by intensive personal application. Under these circumstances his conclusions are entitled to great weight and consideration as an informed judgment of all the facts.

The Trustee has adopted a reasonable and conservative basis for his calculations, including the Gold Field properties and excess working capital. In the main, these conclusions are fortified by his own experience in the management and control of the enterprise since his appointment. The court in In re Childs Co., D.C., 69 F.Supp. 856, adopted the going-concern value arrived at by the Trustee over the figure submitted by the Securities Exchange Commission. The Trustee's figure was somewhat more conservative ($9,980,000 as against $10,300,000) due to the adoption of a lower capitalization rate figure. The Court said:

"I am mindful of the fact that valuation in a situation of this character is not susceptible of mathe-

matical certitude, but rather is fundamentally an educated appraisal of the future based on an informed judgment of all the facts," citing Consolidated Rock Products v. Du Bois, supra. (Cf. In re Atlas Pipeline Corp, D.C., 39 F.Supp. 846; In re Quaker City Cold Storage Co., D.C., 71 F.Supp. 124).

Having arrived at a basic figure of total value in the amount of $12,536,000, it is now incumbent upon the Court to consider the Joint Plan of Reorganization (Second Revised) and to apply the tests regarding the feasibility of the plan and whether it is fair and equitable.

With the valuation data established, the Court is in a position to exercise the informed, independent judgment which appraisal of the fairness of a plan of reorganization entails.

### THE PLAN IS FEASIBLE, FAIR AND EQUITABLE

In determining the feasibility of the plan, the Court has had before it competent, definite, concrete, and reliable evidence from which was acquired a knowledge of the history of the Debtor, the extent of the assets and liabilities, of present, past and probable prospective earnings and expenses. These factors afford a predicate in concluding that the plan offers a reasonable prospect of success and is workable.

The Securities and Exchange Commission in considering the Joint Plan of Reorganization and in summarizing the plan, observed:

"The plan provides for the internal reorganization of the Debtor * *. The reorganized company will retain and continue the steel fabrication and industrial engineering business through its Yuba Manufacturing Division and the Adsco Division and through the two present subsidiaries, Yuba Heat Transfer Corp. and Petro-Chem Development

---

5. (Tr. p. 1519, 1. 14–18; Vol. 14) The 20% discount was based upon certain historical data provided by the S.E.C.

6. See examination conducted by attorney Walter Hoffman, Esq. of Mr. Cadenasso; Tr. p. 1640, et seq.; Vol. 16.

Co., Inc. The Yuba Gold Fields Division will be operated until about 1967 or 1968 when, as estimated, accessible gold reserves will be depleted. The uranium properties, owned by Yuba Development Corporation, a subsidiary of the Debtor, and surplus real and personal property, will be sold as soon as feasible.

Cost of administration, taxes and other priority claims will be paid in full in cash. The principal provisions in the plan relate to the treatment of the three classes of unsecured claims, including the debentures which by the terms of the indenture are subordinated to the Class 2–A creditors. No participation is provided for the common stock since, in the opinion of the Trustee, the Debtor is insolvent.

The plan provides for the distribution to the unsecured creditors of a minimum of $1,050,000 in cash, a maximum of 550,000 shares of preferred stock, $10 par value per share, and a like or greater number of shares of common stock, $10 par value per share, depending upon the reorganization value of the Debtor as determined by the Court. The cash and the aggregate par amounts of preferred and common stocks to be distributed will equal such value.

The Class 2–B creditors will receive their proportionate amount of the cash, and of preferred and common stocks proposed to be issued. * * The Class 2–A creditors will receive the remaining cash and preferred stock and, depending upon the Court's finding as to value, all or part of the remaining common stock, but not exceeding in aggregate par value an amount which, together with the cash and the par value of the preferred stock, equals the dollar amount of their claim. The debenture holders (Class 2–C) will receive such amount of any remaining common stock as is not required for the purpose of satisfying the claims of the Class 2–A credi-

tors, to whom, as noted, the debenture holders are subordinated.

\* \* \*

The preferred stock will be entitled to an annual dividend of $0.50 per share which, commencing in 1966, will be cumulative but only if earned. The perferred stock will also be entitled to a participating dividend with the common stock up to $0.20 per share. Additional dividends on the common stock may be paid without further dividends on the preferred stock. \* \* \*

The preferred stock is to have a liquidation preference of $10.50 per share in case of a voluntary liquidation and $10 per share when liquidation is involuntary, plus accrued dividends. Provision is made for a sinking fund, terminating not later than January 1, 1971, for the retirement of the preferred stock at not more than $10.50 per share, by purchases in the open market and pursuant to calls for tenders. \* \* net income, before depreciation but after certain specified charges, from the Gold Fields Division and Yuba Development Corp., and the net proceeds from the sale of these and surplus real properties, are to be deposited in the sinking fund.

The common stock is to have preemptive rights except under specified circumstances. Each share of preferred and common stock will be entitled to one vote, except that for the election of directors voting is to be cumulative. The plan makes special provision for the election of the majority of the board of directors by the preferred stockholders in the first two years. The Court will designate the initial board of directors, of whom a majority \* \* \* are to be representatives of creditors in Class 2–A and 2–B, who, under the plan, will receive all the preferred stock of the reorganized company." (Advisory Report, pp. 6, 7, 8)

It should be observed that since the filing of the Advisory Report by the S.E.C. the Trustee, Creditors and Debentureholders have filed in open Court their Second Revised Joint Plan wherein they adopted the recommendations made concerning the amendment and clarification of the plan as embraced in the said Report commencing at page 29 thereof, excepting the recommendation made that dividends on the preferred stock should be cumulative, whether earned or not (Advisory Report, p. 30). It is to be observed that the Advisory Report recommended "the issuance of a common stock of no par value." This recommendation has been adopted.[7] It is further observed that the reorganized company will adopt the name Yuba Industries, Inc.

## THE COURT'S FINDINGS

Since the very threshhold of the bankruptcy proceedings, including those taken under Chapter XI, it has been manifest that there was and is no equity for the stockholders and that they must necessarily be excluded from any participation in the reorganization. In Spitzer v. Stichman, 2 Cir., 278 F.2d 402 at 405, the Court said:

"The Supreme Court has given content and fixed meaning to the explicit statutory standard of fairness and equity by its full and absolute priority rule. In so far as it is pertinent here, that rule prescribes that stockholder interests shall not participate in a reorganization unless the debtor is solvent. Its assets must be valued at an amount in excess of the aggregate of the allowed claims of creditors."

The claims of the three classes of creditors which are uncontested and allowed as of May 24, 1965, total $13,-310,449, including interest to September 6, 1961, exclusive of contingent, unliquidated or disputed claims and interest of $3,972,266. The Trustee has established a reserve for contingent, unliquidated or disputed claims and liabilities. (Advisory Report p. 5)

Since the total claims allowed and approved and uncontested exceed the total value of the Debtor as hereinabove found by the Court, the Debtor is insolvent. Additionally, in computing liabilities for this purpose, there would be added additional interest on the allowed claims, accrued during the proceedings, which would be approximately another $4,-000,000.

We are not unmindful of the unfortunate and irreparable loss suffered by many innocent stockholders. The Court should observe that from the inception of the proceedings able counsel representing the respective parties have been vigilant and alert in seeking to conserve and preserve the rights of the stockholders. Every legitimate activity has been pursued by the Court and counsel in attempting to further their interests. The Court accordingly specif-

7. The Supplemental Advisory Report of the Securities and Exchange Commission, filed June 10, 1965, provides in part: "On May 3, 1965, we submitted an Advisory Report on the plan for the internal reorganization of the Debtor proposed jointly by the Trustee and unsecured creditors, in which we concluded that the plan is feasible and would result in fair and equitable treatment among the creditors on the basis of our valuation of the Debtor. We noted, however, that the plan should be clarified and modified in several respects. The plan, as since amended, complies substantially with our suggestions. The principal amendments provide that the common stock of the reorganized company will have no par value, and that, commencing January 1, 1971, the reorganized company, at its option, may redeem the preferred stock at $10.-50 per share plus accumulated dividends. The plan still provides that the 5% dividend on the preferred stock is to be cumulative only if earned. In our Advisory Report we stated that we had no objection to this provision for approximately the first three years after consummation of the plan, but suggested that thereafter, since earnings are expected to reach a higher long-range level, dividends should be made cumulative whether earned or not and that the 2% participating dividend should then be discontinued. We urge again the adoption of such provision."

ically finds that the plan, insofar as it excludes former stockholders from any participation in the reorganization, is fair.

In Consolidated Rock Co. v. Du Bois, supra, Mr. Justice Douglas in this landmark decision, observed (312 U.S. pp. 525, 526, 61 S.Ct. p. 685):

"Findings as to the earning capacity of an enterprise are essential to a determination of the feasibility as well as the fairness of a plan of reorganization. Whether or not the earnings may reasonably be expected to meet the interest and dividend requirements of the new securities is a *sine qua non* to a determination of the integrity and practicability of the new capital structure. It is also essential for satisfaction of the absolute priority rule of Case v. Los Angeles Lumber Products Co. [308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110], supra."

\*    \*    \*    \*    \*    \*

"Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance."

The standard therein set forth has been met in the case at bar.

The Second Revised Joint Plan of Reorganization of the Trustee, Creditors and Debentureholders, the Court finds is feasible, and provides fair and equitable treatment among the several classes of creditors. Their classification as particularly set forth in Paragraph II–A (p. 3), is fair, equitable and just. In this regard, the Court concurs in and adopts the specific findings embraced in the Advisory Report of the Commission (pp. 28, 29):

"We believe that, based on our conclusions as to valuation, the proposed distribution under the plan provides fair and equitable treatment among the three classes of creditors. The Class 2–B, since it is on a parity with the other two classes, will receive its proportionate amount of cash and preferred and common stocks. Fair recognition is accorded to the paramount position of the Class 2–A creditors to whom the Class 2–C is subordinated. \*    \*    \*    the Class 2–A creditors will receive cash and preferred stock, and common stock for the balance of their claims. As preferred stockholders they will be entitled to the benefits of the sinking fund; to priority as to dividends and in liquidation; and to elect a majority of the board in the first two years, during which time it is anticipated that a substantial amount of preferred stock will be retired. Subordinate to the Class 2–A, the Class 2–C creditors will receive the remaining equity in the form of common stock.

Feasibility requires that the proposed plan should, among other things, result in a reorganized company which has a sound capital structure and adequate working capital and which can reasonably be expected to meet the obligation imposed by its capitalization.

The Debtor has outstanding over $14 million of indebtedness, which under the plan is to be retired by a cash payment and by the issuance of preferred and common stocks. The reorganized company, as discussed previously, has excess working capital to carry on its business. As at December 31, 1964, current assets totaled $10,434,749, including cash of about $4,300,000, while current liabilities total $2,929,747. The Debtor thus can meet the proposed distribution of $1,050,000 to credi-

tors and pay such additional allowances as the Court may award.

By the terms of the plan, the proposed cash distribution amounts to $1,050,000 and on our total valuation, as well as the Trustee's and Cadenasso's, there will be issued 550,000 shares of preferred stock, $10 par value per share, or an aggregate par value of $5,500,000.(23) ([23] If the cash distribution is increased, the preferred stock to be issued will be decreased by a like amount in par value.) The preferred stock will bear a dividend rate of 5% (50 cents per share), cumulative only if earned, and a participating dividend with the common stock up to another 2%. The plan provides, as noted previously, for the mandatory retirement of preferred stock out of prospective earnings of the Gold Fields and the sales proceeds of this and other properties, * * *.

Initially the 5% dividend will total $275,000 per year. Thereafter, this annual amount may decline, depending on the amount of preferred stock that will be retired through the sinking fund or otherwise. From the earnings forecast it appears that the 5% preferred stock dividend will be earned and that there will be income available for dividends on the common stock and for the participating dividend on the preferred stock."

### CONCLUSION

In view of the specific findings of the Court hereinabove set forth, the Court has concluded that the Joint Plan of Reorganization of Trustee, Creditors and Debentureholders (Second Revised) is fair, equitable and feasible and the said plan is approved.

Any and all objections either orally or in writing heretofore filed, presented or urged to the plan, including the memorandum of objections of John Lucas, Jr. filed May 20, 1965, are, and each of them is, overruled.

In submitting the said plan to the Creditors for their consideration and acceptance the Trustee is authorized and directed to include in the plan as approved, by way of an appendix thereto:

(a) The most recent balance sheet of the corporation; and

(b) A *pro forma* balance sheet of the corporation as of the estimated date of confirmation.

Such other and additional orders and decrees may hereafter be made and entered herein as may be meet, proper and just in order to accomplish an early acceptance and confirmation of the said plan by the Creditors, and the ultimate consummation of the plan.